# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON, TACOMA DIVISION

| | |
|---|---|
| Joncee Hull and Sharon Shrout, individually and on behalf of others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Multicare Health System, Multicare Tacoma General Hospital, and Marybridge Children's Hospital, <br><br> Defendants. | **Case No:** <br><br> **Class Action Complaint** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

1. Plaintiffs Joncee Hull ("Plaintiff Hull") and Sharon Shrout ("Plaintiff Shrout") (or jointly as "Plaintiffs") bring this class action complaint against Multicare Health System ("MHS"), Multicare Tacoma General Hospital ("MTGH"), and Marybridge Children's Hospital ("MBH") (or jointly as "Defendants"), challenging their unfair, deceptive, and unlawful practice of

subjecting Plaintiffs and other similarly situated uninsured and underinsured patients to collection efforts without first affirmatively screening them to determine their financial eligibility for free or discounted hospital care under Washington's Charity Care Act, RCW Ch. 70.170 ("Charity Care Act").

2. The classes in this case encompass Defendants' patients who were provided emergency care and (1) were uninsured and not covered by a governmental healthcare program or any other third-party payment source, or (2) were underinsured because any private insurance, governmental healthcare program or third-party source available to them was insufficient to cover the full cost of their care.

3. Plaintiffs were underinsured when they went to Defendants' hospital and received emergency care for which she alleges they should have received free or discounted care under the Charity Care Act.

4. The Charity Care Act requires Defendant to grant free or discounted care to qualifying uninsured or underinsured patients upon determining their income is below 200% of the federal poverty level. This obligation to charity care continues after the hospital assigns a patient's account to collections, including after its collecting agency files suit to collect on the account. Under current guidelines, 200% of the federal poverty level for a family of four in Washington is an income of $48,600 per year.

5. The Charity Care Act requires Defendant to screen its patients at or near the time of service to determine whether they qualify for free or discounted care based on their income. This affirmative proactive screening to determine each patient's financial eligibility for charity care must occur *before* any collection efforts.

6. Plaintiffs are informed and believe, and thereon allege, that Defendants have engaged, and continue to engage, in a pattern and practice of collecting or

seeking to collect from patients without first affirmatively screening them to determine whether they qualify for charity care based on their income.

7. Representing uninsured and underinsured patients, Plaintiffs brings their claims in this case on behalf of themselves and similarly situated patients who 1) received emergency care medical treatment; 2) were uninsured or underinsured by insurance or any third-party source of payment at the time of treatment; and 3) were subject to collections even though Defendants' account records show no affirmative screening to determine Plaintiffs' eligibility for charity care.

8. On behalf of both uninsured and underinsured patients who received emergency medical services from Defendants but did not receive the charity care to which they were entitled, this lawsuit seeks: 1) declaratory and injunctive relief to require Defendants to fully comply with the requirements of the Charity Care Act; 2) recovery of excess payments made by Plaintiffs and class members for the proposed uninsured and underinsured classes when they were indigent; and 3) damages under the Washington Consumer Protection Act RCW 19.86 for Defendants' unfair and deceptive practices.

9. Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain directly to a plaintiff, which Plaintiff alleges on her personal knowledge.

10. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

11. All the conduct engaged in by Defendants took place in the Western District of Washington.

12. Any violations by Defendants were knowing, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such specific violation.

## JURISDICTION AND VENUE

13. Jurisdiction of this Court arises pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), 1453, and 1711-1715 ("CAFA"), 28 U.S.C. § 1331, and 28 U.S.C. § 1367 for supplemental state claims.

14. This action arises out of Defendants' violations of the Washington Charity Care Act and the Washington Consumer Protection Act RCW 19.86.

15. Because Defendants conduct business within the State of Washington, personal jurisdiction is established.

16. Venue is proper pursuant to 28 U.S.C. § 1391 because the events leading to the cause of action occurred in the City of Tacoma, County of Pierce, State of Washington.

17. At all times relevant, Defendants conducted business within the State of Washington.

## PARTIES

18. Plaintiff Hull is a natural person who resides in the City of Tacoma, State of Washington.

19. Plaintiff Shrout is a natural person who resides in the City of Tacoma, State of Washington.

20. Defendant MTGH Hospital is a hospital located in the city of Tacoma, State of Washington.

21. Defendant MBH is a hospital located in the city of Tacoma, State of Washington.

22. Defendant MHS is believed to be the parent corporation of MTGH located in the City of Tacoma, in the State of Washington.

23. Defendant MHS is the owner of multiple hospitals according to MHS's website.

**GENERAL ALLEGATIONS**

24. In 1989, the Washington legislature enacted the Charity Care Act and mandated the provision of charity care by all Washington hospitals. The legislature concluded that this is essential to "moderate health care costs and promote access to health care services." RCW 70.170.010(2). It found that all hospitals must provide charity care in order to ensure access to health care for low-income residents. "Therefore, the legislature intends that charity care requirements and related enforcement provisions for hospitals be explicitly established." RCW 70.170.010(3).

25. Washington's Charity Care Act and its implementing regulations (collectively the "Act" or "Charity Care Act") require all Washington hospitals to provide charity care to indigent patients, who are defined as patients with incomes at or below 200% of the federal poverty level. *See* RCW 70.170.060(5) (charity care for full amount of charges for all patients at or below 100% of the federal poverty level); WAC 246-453-040(2) (partial charity care for patients at or below 200% of poverty level); WAC 246-453-010(4) (defining "indigent persons" as "patients who have exhausted any third party sources, including Medicare and Medicaid, and whose income is equal to or below 200% of the federal poverty standards").

26. The Charity Care Act specifically requires hospitals to affirmatively screen all patients at or near the time of admission to the hospital to determine whether they are indigent, and to conduct this affirmation screening *before* demanding payment for services. RCW 70.170.060(5), (6); WAC 246-453-020(1), (1)(a), (1)(b).

27. The Charity Care Act further prohibits hospital policies or practices which result in a significant reduction in the proportion of indigent patients served by the hospital. RCW 701.170.060(1).

28. These provisions require hospitals to affirmatively and proactively screen all patients at or near the time of admission to determine whether they qualify for free or discounted care based on their low income, and this initial determination "*shall* precede collection efforts directed to the patient." RCW 70.170.060(6) (emphasis added); see also WAC 246-453-020(1)(a) ("Collection efforts shall include any demand for payment or transmission of account documents or information which is not clearly identified as being intended solely for the purpose of transmitting information to the responsible party.").

29. This "initial determination of sponsorship status" that hospitals must make before initiating collection efforts is an affirmative screening to identify whether each patient "may meet the criteria for designation as an indigent person qualifying for charity care." WAC 246-453-010(19).

30. Under the Charity Care Act, when a hospital fails to affirmatively screen patients to conduct this required initial determination of eligibility for charity care based on income, the hospital is precluded from engaging in collection efforts directed to the patient. RCW 70.170.060(6); WAC 246-453-020(1)(a).

31. Statewide, approximately 14% of Washington residents have household income below 100% poverty level,[1] and over 31% are in households with income below 200% of the poverty level.[2] Based on the current state population of approximately 7.1 million people,[3] this means that approximately 994,000 state residents (14% times 7,100,000) live below 100% of poverty level and would qualify for free hospital care based on income, and another 1.2 million state residents (31% time 7,100,000 minus

---

[1] *See* http://www.washington.edu/news/2014/09/18/poverty-income-inequality-increase-in-washington-state/.

[2] *See* http://kff.org/other/state-indicator/population-up-to-200-fpl.

[3] *See* http://population2016.com/population-of-washington-in-2016.html.

994,000) have incomes between 100% and 200% of poverty level and would qualify for discounted care based on their income under the Charity Care Act. *See* RCW 70.170.060(5); WAC 246-453-040(1) & (2).[4]

32. Because Medicaid expansion covers up to 138% of poverty level, over half a million adults in Washington who were previously uninsured became eligible for coverage under the Patient Protection and Affordable Care Act ("ACA"). As a result, the uninsured rate in in Washington has dropped from 14 percent of the state's population in 2013 to 7.3 percent today.[5]

## FACTUAL ALLEGATIONS

33. Plaintiffs are informed and believes that contrary to Defendants' legal obligations to affirmatively screen patients for charity care before engaging in collection efforts, Defendants have engaged, and continue to engage, in a pattern and practice of collecting or seeking to collect from their patients without first affirmatively screening patients to determine whether patients qualify for charity care based on their income.

**Plaintiff Joncee Hull**

34. In or around May 2016, Plaintiff Hull received emergency services from MHS at MTGH.

35. MTGH completed an emergency evaluation on Plaintiff Hull and ended up completing a gall bladder removal on Plaintiff Hull.

36. On this trip to the hospital in or around May 2016, Defendants did *not* affirmatively screen Plaintiff Hull for charity care.

37. As a result of this visit, Defendants charged Plaintiff Hull an amount which Plaintiff Hull could not afford.

38. Plaintiff Hull was underinsured at the time of service in or around May 2016.

---

[4] Under 2016 poverty guidelines, 100% and 200% of poverty level for a family of four are $24,300 and $48,600 per year. *See* https: //aspe.hhs.gov/poverty-guidelines.

[5] *See* https://www.insurance.wa.gov/about-oic/newsroom/news/2016/02-02-2016.html.

39. Subsequently, Plaintiff Hull's account with Defendants was sent to a debt collector, Puget Sound Collections ("PSC")

40. PSC subsequently started collecting money from Plaintiff Hull indicating that Plaintiff Hull owed money to MTGH.

41. Defendants did not determine Plaintiff Hull's charity care eligibility before sending this account to PSC for collection.

42. Defendants never contacted Plaintiff Hull regarding her hospital bill before referring Plaintiff Hull's account to PSC.

43. Because of Defendants' failure to screen Plaintiff Hull, Plaintiff Hull has been paying PSC from the time PSC started collecting to the present.

44. The first time Plaintiff Hull heard about this outstanding bill with Defendants was when she was contacted by PSC.

45. If Defendants had affirmatively screened Plaintiff Hull for charity care, it would have determined that her income was below 200% of the federal poverty level in 2016 and that based on her income, she was eligible for charity care under the Charity Care Act.

46. Because Plaintiff Hull was underinsured and her income was less than 200% of the federal poverty level when she went to Defendants' emergency center in 2016, she qualified for and should have received charity care from Defendants under the Charity Care Act.

47. Through this conduct Defendants violated RCW 19.86.020 by not screening Plaintiff Hull for charity care and sending Plaintiff Hull's account directly to a debt collector.

48. As a result of Defendants' abusive conduct, Plaintiff Hull has monetary damages in the form of payments to a debt collector.

49. As a result of Defendants' abusive conduct, Plaintiff Hull suffered actual damages in the form of mental anguish and emotional distress, which was manifested by symptoms including but not limited to: stress, anxiety, worry,

1  restlessness, irritability, embarrassment, loss of sleep, feelings of hopelessness, and helplessness all impacting his job and personal relationships.

**Plaintiff Sharon Shrout**

50. On or around March 2, 2017, Plaintiff Shrout's daughter received emergency services relating to an injury to her daughter from MHS at MBH.

51. MBH completed an emergency evaluation on Plaintiff Shrout's daughter, treated the injury, and ended up sending Plaintiff Shrout and her daughter home.

52. On this trip to the hospital in or around March 2, 2017, Defendants did *not* affirmatively screen Plaintiff Shrout for charity care.

53. As a result of this visit, Defendants charged Plaintiff Shrout an amount which Plaintiff Shrout could not afford.

54. Plaintiff Shrout was underinsured at the time of service in or around March 2, 2017.

55. Subsequently, Plaintiff's account with Defendants was sent to a debt collector,

56. State Collection Service, Inc. ("SCS") subsequently started attempting to collect money from Plaintiff Shrout indicating that Plaintiff Shrout owed money to MBH.

57. Defendants did not determine Plaintiff Shrout's charity care eligibility before sending this account to SCS for collection.

58. Because of Defendants' failure to screen Plaintiff Shrout, Plaintiff Shrout has been receiving numerous phone calls from SCS in an attempt to collect the debt.

59. Because Plaintiff was underinsured, she should have been screened for charity care from Defendants under the Charity Care Act.

60. Through this conduct Defendants violated RCW 19.86.020 by not screening Plaintiff Shrout for charity care and sending Plaintiff Shrout's account directly to a debt collector.

61. As a result of Defendants' abusive conduct, Plaintiff Shrout has monetary damages in the form of payments to a debt collector.

62. As a result of Defendants' abusive conduct, Plaintiff Shrout suffered actual damages in the form of mental anguish and emotional distress, which was manifested by symptoms including but not limited to: stress, anxiety, worry, restlessness, irritability, embarrassment, loss of sleep, feelings of hopelessness, and helplessness all impacting his job and personal relationships.

## CLASS ALLEGATIONS

63. As a result Plaintiffs brings this action on behalf of themselves and all others similarly situated, as a member of the proposed class (hereafter "Class") defined as follows:

The Class

All individuals (or their guardians or representatives) who within the statute of limitations (a) received emergency care medical treatment from Defendant MHS; (b) uninsured or underinsured by insurance or any other third-party source of payment at the time of treatment; and (c) were subject to collections even though MHS's account records show no affirmative screening to determine the patient's eligibility for charity care.

Sub-Class #1

All individuals (or their guardians or representatives) who within the statute of limitations (a) received emergency care medical treatment from MTGH; (b) uninsured or underinsured

by insurance or any other third-party source of payment at the time of treatment; and (c) were subject to collections even though MTGH's account records show no affirmative screening to determine the patient's eligibility for charity care.

Sub-Class #2

All individuals (or their guardians or representatives) who within the statute of limitations (a) received emergency care medical treatment from MBH; (b) uninsured or underinsured by insurance or any other third-party source of payment at the time of treatment; and (c) were subject to collections even though MBH's account records show no affirmative screening to determine the patient's eligibility for charity care.

64. Plaintiffs represent, and are a member of, the Class, consisting of all persons within the United States who received emergency care medical treatment from Defendants, was underinsured at the time of treatment, and was subject to collections even though Defendants' account records show no affirmative screening to determine Plaintiffs' eligibility for charity care, within the the statute of limitations.

65. Defendants, its employees and agents are excluded from the Class. Plaintiffs do not know the number of members in the Class, but believe the Class members number in the hundreds, if not more. Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

66. The Class is so numerous that the individual joinder of all of its members is impractical. While the exact number and identities of the Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs are informed and believes and thereon alleges that the Class includes hundreds, if not thousands of members. Plaintiffs

allege that the Class members may be ascertained by the records maintained by Defendants.

67. Common questions of fact and law exist as to all members of the Class, which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which may be determined without reference to the individual circumstances of any Class members, include, but are not limited to, the following:

    a.    Whether the Charity Care Act requires Defendants to affirmatively screen all patients at or near the time of admission to determine whether they are indigent;

    b.    Whether under the Charity Care Act, Defendants are required to conduct this affirmative screening of all patients before demanding payment for services;

    c.    Whether Defendants have a pattern and practice of not affirmatively and proactively screening uninsured patients at or near the time of their admission to determine whether they are indigent;

    d.    Whether Defendants have a pattern and practice of demanding payment from uninsured and underinsured patients without first affirmatively screening them to determine whether they are indigent;

    e.    Whether Defendants pattern and practice of demanding payment from uninsured or underinsured patients without first affirmatively screening them to determine whether they are indigent is unfair and/or deceptive;

    f.    Whether Defendants' pattern and practice of demanding payment from uninsured and underinsured patients without first affirmatively screening them to determine whether they are indigent is unlawful under any of the causes of action asserted herein;

   g. Whether Defendants have been unjustly enriched by these practices; and

   h. Whether the foregoing acts and conduct of Defendants render them liable to Plaintiffs and the class members for restitution declaratory, and injunctive relief, and/or damages.

68. As an underinsured person that received emergency care from Defendants and was not affirmatively screened to determine whether they were indigent, Plaintiffs are asserting claims that are typical of the Class.

69. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in the prosecution of class actions.

70. A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

71. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to

such adjudications or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

72. Defendants have acted or refused to act in respects generally applicable to the Class members, thereby making appropriate final and injunctive relief with regard to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I

### DECLARATORY RELIEF

73. Plaintiffs repeat, re-allege, and incorporate by reference, all other paragraphs.
74. Pursuant to the Declaratory Judgments Act, RCW Ch. 7.24, Plaintiffs and class members are entitled to a declaration that under the Charity Care Act, Defendants are required to affirmatively screen all patients at or near the time of admission to determine whether they are indigent, and that it is required to conduct this affirmative screening before demanding payment for services.

### COUNT II

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

### RCW 19.86

75. Plaintiffs repeat, re-allege, and incorporate by reference, all other paragraphs.
76. Defendants' failure to comply with the Charity Care Act as set forth above violates the Washington Consumer Protection Act ("CPA"), RCW 19.86, as to Plaintiffs and class members.
77. Specifically, by failing to comply with the Charity Care Act as set forth above, Defendants have engaged in, and continue to engage in, unfair and deceptive acts or practices in trade or commerce in violation of the CPA by failing to affirmatively screen patients for charity care and then immediately sending the outstanding bill to collections without contacting the patients.

78. Such conduct affects the public interest and has caused injury to the business or property of Plaintiffs and class members.
79. Plaintiffs suffered emotional damages because of this conduct by Defendants.
80. As a result of each and every violation of the Washington Consumer Protection Act, Plaintiffs are entitled to any actual damages, costs, and attorneys fees pursuant to RCW 19.86.090.
81. Plaintiffs are further requesting the court treble damages pursuant to RCW 19.86.090 due to the reprehensible nature of Defendants' conduct.

## COUNT III

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

82. Plaintiffs repeat, re-allege, and incorporate by reference, all other paragraphs.
83. Defendants' conduct, as alleged above, also constitutes a breach of the covenant of good faith and fair dealing.
84. Plaintiffs and class members entered into express or implied-in-fact contractual relationships with Defendants when they went to Defendants' emergency room for the purpose of receiving emergency medical care.
85. Implied into every contract is a covenant of good faith and fair dealing. This covenant of good faith and fair dealing requires that all parties will act reasonably and will not act so as to prevent performance by the other party.
86. Under Washington law, a statutory violation can constitute a breach of covenant of good faith and fair dealing.
87. Because the requirements of the Charity Care Act are likely incorporated into the contractual relationship between Defendants and its patients, Defendants' violations of the Charity Care Act can also constitute a breach of its covenant of good faith and fair dealing.
88. Defendants violated the Charity Care Act and thereby breached its covenant of good faith and fair dealing owed to Plaintiffs and class members by failing to affirmatively screen them at or near the time of admission to determine

whether they were indigent, and demanding payment for services without conducting the required affirmative screening, and thereby caused injury and consequential damages to Plaintiffs and class members.

## COUNT IV

### UNJUST ENRICHMENT AND RESTITUTION

89. Plaintiffs repeat, re-allege, and incorporate by reference, all other paragraphs.
90. Defendants' actions, as described above, are unconscionable and unlawful.
91. Defendants have received money which belongs to Plaintiffs and class members which in equity and good conscience Defendants ought to pay to Plaintiffs and class members, along with interest.

## COUNT V

### UNJUST ENRICHMENT AND RESTITUTION (INJUNCTIVE RELIEF)

92. Plaintiffs repeat, re-allege, and incorporate by reference, all other paragraphs.
93. Plaintiffs and class members are entitled to an injunction under the CPA, under the common law, and under any other applicable laws enjoining Defendants from continuing to engage in the conduct alleged herein.
94. In particular, Plaintiffs and class members are entitled to an injunction under the CPA, under the common law, and under any other applicable laws to enjoin further violations fo the Charity Care Act and/or unfair or deceptive acts and practices related to Defendants' provision of charity care (or lack thereof) to indigent persons, including an injunctive order requiring Defendants to affirmatively screen all patients at or near the time of admission to determine whether they are indigent, and requiring that it conduct this affirmative screening before demanding payment from uninsured or underinsured patients.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class members pray that judgment be entered against Defendants, and Plaintiffs be awarded damages

from Defendants, as follows:

Plaintiffs respectfully requests the Court grant Plaintiff and Class members the following relief against Defendants:

- ¥ An order certifying the Class;
- ¥ An order certifying the undersigned counsel as Class Counsel;
- ¥ A declaratory judgment that Defendants' actions as discussed herein is unlawful;
- ¥ An order requiring Defendants, at their own cost, to notify all members of the Classes of the unlawful acts discussed herein;
- ¥ Injunctive relief stopping Defendants from further failure to affirmatively screen patients for charity care;
- ¥ Actual damages suffered by Plaintiffs and each Class member, pursuant, against Defendants.
- ¥ An award of any such amount as the Court may allow for all other class members in accordance with proof at trial, including treble damages under the CPA, against Defendants;
- ¥ An award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2), against Defendants;
- ¥ Award Plaintiffs and class members their costs of suit, including expert fees, and reasonable attorney's fess as provided by the CPA and other applicable law; and
- ¥ Any other relief the Court may deem just and proper.

///
///
///
///

95. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury.

Respectfully submitted,

**Kazerouni Law Group**

Date: May 3, 2018                By: *s/ Ryan L. McBride*
Ryan L. McBride
Attorneys for Plaintiff

*s/Joshua B. Swigart*
Joshua B. Swigart, Esq. (SBN 49422)
josh@westcoastlitigation.com
**Hyde & Swigart**
2221 Camino Del Rio S., #101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile:  (619) 297-1022


*s/Abbas Kazerounian*
Abbas Kazerounian (SBN 48522)
ak@kazlg.com
Ryan L. McBride (SBN 50751)
ryan@kazlg.com
**Kazerouni Law Group, APC**
1546 NW 56th Street
Seattle, WA 98107
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

Attorneys for Plaintiffs and the putative class